**Appeal No. 2021-1070**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

NOVARTIS PHARMACEUTICALS CORPORATION,

*Plaintiff-Appellee*,

v.

ACCORD HEALTHCARE INC., AUROBINDO PHARMA LIMITED, AUROBINDO PHARMA USA, INC., DR. REDDY'S LABORATORIES, INC., DR. REDDY'S LABORATORIES, LTD., EMCURE PHARMACEUTICALS, HERITAGE PHARMACEUTICALS INC., GLENMARK PHARMACEUTICALS INC., USA, GLENMARK PHARMACEUTICALS LIMITED, HETERO USA INC., HETERO LABS LIMITED UNIT-V, HETERO LABS LIMITED, MYLAN PHARMACEUTICALS, INC., PRINSTON PHARMACEUTICAL INC., STRIDES GLOBAL PHARMA PRIVATE LIMITED, STRIDES PHARMA, INC., TORRENT PHARMA INC., TORRENT PHARMACEUTICALS LTD., ZYDUS PHARMACEUTICALS (USA) INC., CADILA HEALTHCARE LIMITED, APOTEX INC., APOTEX CORP., SUN PHARMACEUTICAL INDUSTRIES LTD., SUN PHARMACEUTICAL INDUSTRIES INC., SUN PHARMA GLOBAL FZE,

*Defendants,*

HEC PHARM CO., LTD., HEC PHARM USA INC.,

*Defendants-Appellants.*

**On Appeal from the United States District Court for the District of Delaware in No. 1:18-cv-01043-KAJ**
**Honorable Kent A. Jordan, Circuit Judge**

**PRINCIPAL BRIEF FOR APPELLEE NOVARTIS PHARMACEUTICALS CORPORATION**

*(For Counsel of Record See Inside Cover)*

Jane M. Love, Ph.D.
 *Principal Attorney*
Robert Trenchard
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue,
New York, NY 10166-0193
(212) 351-4000

*Counsel for Appellee Novartis Pharmaceuticals Corporation.*

# LANGUAGE OF CLAIMS – U.S. PATENT NO. 9,187,405

1. A method for reducing or preventing or alleviating relapses in Relapsing-Remitting multiple sclerosis in a subject in need thereof, comprising orally administering to said subject 2-amino-2- [2-(4-octylphenyl)ethyl]propane-1,3-diol, in free form or in a pharmaceutically acceptable salt form, at a daily dosage of 0.5 mg, absent an immediately preceding loading dose regimen.

2. The method according to claim **1**, wherein 2-amino-2-[2-(4-octylphenyl) ethyl]propane-1,3-diol hydrochloride is administered.

3. A method for treating Relapsing-Remitting multiple sclerosis in a subject in need thereof, comprising orally administering to said subject 2-amino-2-[2-(4-octylphenyl)ethyl]propane-1,3-diol, in free form or in a pharmaceutically acceptable salt form, at a daily dosage of 0.5 mg, absent an immediately preceding loading dose regimen.

4. The method according to claim **3**, wherein 2-amino-2-[2-(4-octylphenyl)ethyl]propane-1,3-diol hydrochloride is administered.

5. A method for slowing progression of Relapsing-Remitting multiple sclerosis in a subject in need thereof, comprising orally administering to said subject 2- amino-2 [2-(4-octylphenyl)ethyl]propane-1,3-diol, in free form or in a pharmaceutically acceptable salt form, at a daily dosage of 0.5 mg, absent an immediately preceding loading dose regimen.

6. The method according to claim **5**, wherein 2-amino-2-[2-(4-octylphenyl) ethyl]propane-1,3-diol hydrochloride is administered.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT
## CERTIFICATE OF INTEREST

|  |  |
|---|---|
| **Case Number:** | 2021-1070 |
| **Short Case Caption:** | Novartis Pharmaceuticals v. Accord Healthcare Inc. |
| **Filing Party/Entity:** | Novartis Pharmaceuticals Corporation |

> **Instructions: Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. Please enter only one item per box; attach additional pages as needed and check the relevant box. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).**

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

**Date:**  3/9/2021          **Signature:**  */s/ Jane M. Love, Ph.D.*

                              **Name:**

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Novartis Pharmaceuticals Corporation | Novartis AG | Novartis AG |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable        ☐    Additional pages attached

| | | |
|---|---|---|
| Robert W. Trenchard<br>Laura Corbin<br>Kyanna Sabanoglu<br>Sung Bin Lee<br>Emil N. Nachman<br>Shyam Shanker<br>Gibson Dunn & Crutcher, LLP<br>200 Park Avenue<br>New York, NY 10166 | Daniel M. Silver<br>Alexandra M. Joyce<br>Benjamin A. Smyth<br>McCarter & English, LLP<br>Renaissance Centre<br>405 N. King Street, 8th Floor<br>Wilmington, DE 19801 | |
| Christine L. Ranney<br>Gibson, Dunn & Crutcher LLP<br>1801 California Street<br>Denver, CO 80202-2642 | Jordan Bekier<br>Andrew Blythe<br>Gibson, Dunn & Crutcher LLP<br>333 South Grand Avenue, Los Angeles, CA 90071-3197 | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable    ☐ Additional pages attached

| | | |
|---|---|---|
| *Argentum Pharmaceuticals LLC v. Novartis Pharmaceuticals Corp.*, Case No. 20-779 (S. Ct.) | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable    ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Page

STATEMENT OF RELATED CASES ................................................. xiv

STATEMENT OF JURISDICTION ...................................................... xv

INTRODUCTION ................................................................................. 1

STATEMENT OF ISSUES ..................................................................... 5

STATEMENT OF THE CASE ................................................................. 6

    A.    The Invention and the '405 Patent ........................................... 6

        1.    Fingolimod as of June 2006 ......................................... 6

        2.    The Inventors' Discovery of Lower Dose Treatment ................. 7

        3.    The '405 Patent ........................................................... 9

    B.    The Patent Surmounts Multiple Invalidity Challenges ....................... 12

        1.    Pre-Trial ....................................................................... 12

        2.    Trial ............................................................................. 14

        3.    The Trial Decision ..................................................... 15

SUMMARY OF THE ARGUMENT ..................................................... 19

ARGUMENT ........................................................................................ 21

I.    The District Court's Decision to Credit Novartis's Expert Testimony Was Correct, and Not Clear Error ................................. 22

II.    The Specification Describes the Use of 0.5 mg Fingolimod to Treat MS ............................................................................... 27

    A.    The Claims Track the Patent's Human Example ............................. 27

        1.    The Human Example Describes the Same Drug, at the Same Dose, to Treat the Same Condition as in the Claims ................. 27

2.    No "Blaze Marks" Are Needed to Find the  Human Example's Support for the Claims ............................................29

3.    The Human Prophetic Example  Suffices for Written Description ................................................................31

B.    The Specification as a Whole Further  Supports the Claims ................................................................36

1.    The Specification Focuses on  Using Fingolimod to Treat RRMS ................................................................36

2.    The Animal Example Supports the 0.5 mg Daily Dose ............37

III.    The Specification Describes a "Daily" Dose  Given "Initially," and Thus "Absent an Immediately  Preceding Loading Dose Regimen" ................................................................43

A.    The District Court Correctly Read the Patent's Text to Support "Absent an Immediately Preceding Loading Dose Regimen" ................................................................43

B.    The District Court Properly Applied the *Ariad* Standard for Written Description ................................................................48

C.    The Prosecution History Supports the Claims ....................52

IV.    The District Court's Written Description Conclusions  Were Consistent with How the Court Read Kappos 2006 ....................54

CONCLUSION ................................................................58

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re '318 Patent Infringement Litig.*,
  583 F.3d 1317 (Fed. Cir. 2009) ........................................................32

*Acrow Corp. of Am. v. U.S.*,
  97 Fed. Cl. 182 (Fed. Cl. 2011) ........................................................47

*Alcon Res. Ltd. v. Barr Labs., Inc.*,
  745 F.3d 1180 (Fed. Cir. 2014) ..................................................32, 34

*All Dental Prodx, LLC v. Advantage Dental Products, Inc.*,
  309 F.3d 774 (Fed. Cir. 2002) ....................................................45, 52

*Allergan, Inc. v. Barr Labs, Inc.*,
  501 F. App'x 965 (Fed. Cir. 2013) ...................................................24

*Allergan, Inc. v. Sandoz Inc.*,
  796 F.3d 1293 (Fed. Cir. 2015) .............................................21, 32, 34

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.*,
  725 F.2d 1350 (Fed. Cir. 1984) .........................................................52

*Anderson v. City of Bessemer City, N.C.*,
  470 U.S. 564 (1985).........................................................3, 19, 21, 56

*Application of Ruschig*,
  379 F.2d 990 (C.C.P.A. 1967) ..........................................................29

*Application of Wertheim*,
  541 F.2d 257 (C.C.P.A. 1976) ..........................................................46

*Argentum Pharm. LLC v. Novartis Pharm. Corp.*,
  956 F.3d 1374 (Fed. Cir. 2020) .........................................................13

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 (Fed. Cir. 2010) ..................... 1, 16, 22, 28, 31, 32, 48, 49, 50, 55

*Centrak, Inc. v. Sonitor Techs., Inc.*,
  915 F.3d 1360 (Fed. Cir. 2019) .........................................................34

*Centricut, LLC v. Esab Group, Inc.*,
  390 F.3d 1361 (Fed. Cir. 2004) .......................................................23

*Cephalon, Inc. v. Watson Pharm., Inc.*,
  707 F.3d 1330 (Fed. Cir. 2013) .......................................................56

*Crown Operations Int'l, Ltd. v. Solutia Inc.*,
  289 F.3d 1367 (Fed. Cir. 2002) .......................................................45

*Eiselstein v. Frank*,
  52 F.3d 1035 (Fed. Cir. 1995) .........................................................45

*Eldred v. Ashcroft*,
  537 U.S. 186 (2003)...........................................................................57

*Estee Lauder, Inc. v. L'Oreal, S.A.*,
  129 F.3d 588 (Fed. Cir. 1997) ...........................................................3

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
  234 F.3d 558 (Fed. Cir. 2000), *vacated on other grounds*, 535 U.S.
  722 (2002)...........................................................................................53

*Fresenius USA, Inc. v. Baxter Intern., Inc.*,
  582 F.3d 1288 (Fed. Cir. 2009) ..................................................30, 50

*Fujikawa v. Wattanasin*,
  93 F.3d 1559 (Fed. Cir. 1996) .........................................................29

*FWP IP APS v. Biogen MA, Inc.*,
  749 F. App'x 969 (Fed. Cir. 2018) ..................................................29

*Glaxo Wellcome, Inc. v. Impax Labs., Inc.*,
  356 F.3d 1348 (Fed. Cir. 2004) .......................................................53

*Graham v John Deere Co.*,
  383 U.S. 1 (1966)...............................................................................39

*Hoffmann-La Roche, Inc. v. Promega Corp.*,
  323 F.3d 1354 (Fed. Cir. 2003) .......................................................31

*Hyatt v. Boone*,
  146 F.3d 1348 (Fed. Cir. 1998) .......................................................51

*Idenix Pharm. LLC v. Gilead Sciences, Inc.*,
   941 F.3d 1149 (Fed. Cir. 2019) ........................................................28

*Immunex Corp. v. Sandoz Inc.*,
   964 F.3d 1049 (Fed. Cir. 2020) ........................................................41

*Inphi Corp. v. Netlist, Inc.*,
   805 F.3d 1350 (Fed. Cir. 2015) ...........................................48, 49, 51

*Kao Corp. v. Unilever U.S., Inc.*,
   441 F.3d 963 (Fed. Cir. 2006) .........................................................21

*Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*,
   863 F.2d 867 (Fed. Cir. 1988) .........................................................54

*Knorr v. Pearson*,
   671 F.2d 1368 (C.C.P.A. 1982) .........................................................3

*In re Kolstad*,
   No. 90–1096, 1990 WL 71370 (Fed. Cir. June 1, 1990) ..................51

*L.A. Biomedical Research Inst. at Harbor-UCLA Med. Ctr. v. Eli Lilly
   & Co.*,
   849 F.3d 1049 (Fed. Cir. 2017) .......................................................28

*Life Techs., Inc. v. Clontech Labs. Inc.*,
   224 F.3d 1320 (Fed. Cir. 2000) .......................................................39

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
   424 F.3d 1336 (Fed. Cir. 2005) .......................................................41

*Lockwood v. Am. Airlines, Inc.*,
   107 F.3d 1565 (Fed. Cir. 1997) .......................................................28

*Microsoft Corp. v. i4i Ltd. P'ship*,
   564 U.S. 91 (2011) ..........................................................................52

*Miles Labs., Inc. v. Shandon Inc.*,
   997 F.2d 870 (Fed. Cir. 1993) .........................................................21

*Nalpropion Pharm., Inc. v. Actavis Labs. FL, Inc.*,
   934 F.3d 1344 (Fed. Cir. 2019), *cert. denied sub nom.* 140 S. Ct.
   2804 (2020)..................................................... 21, 24, 33, 41, 51, 56

*Nike, Inc. v. Adidas AG*,
    812 F.3d 1326 (Fed. Cir. 2016) .................................................48, 49

*Nuvo Pharm. (Ireland) Designated Activity Co. v. Dr. Reddy's Labs,
    Inc.*, 923 F. 3d 1368 (Fed. Cir. 2019) .................................. 25, 32, 33, 34, 35, 42

*In re Omeprazole Pat. Litig.*,
    281 F. App'x 974 (Fed. Cir. 2008) ....................................................26

*Pandrol USA, LP v. Airboss Ry. Prods., Inc.*,
    424 F.3d 1161 (Fed. Cir. 2005) ....................................................46, 52

*Ex parte Parks*,
    30 USPQ 2d 1234 (B.P.A.I. 1993) ....................................................46

*Pfizer Inc. v. Watson Pharm., Inc.*,
    920 F. Supp. 2d 552 (D. Del. 2013)....................................................32

*Pfizer, Inc. v. Teva Pharm. USA, Inc.*,
    518 F.3d 1353 (Fed. Cir. 2008) ....................................................21

*Proveris Scientific Corp. v. Innovasystems, Inc.*,
    536 F.3d 1256 (Fed. Cir. 2008) ....................................................24

*Purdue Pharma L.P. v. Faulding Inc.*,
    230 F.3d 1320 (Fed. Cir. 2000) ....................................................29

*Santarus, Inc. v. Par Pharm., Inc.*,
    694 F.3d 1344 (Fed. Cir. 2012) .................................................24, 48, 49, 50, 52

*Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*,
    528 F.3d 1365 (Fed. Cir. 2008) ....................................................21

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) ....................................................44

*Streck, Inc. v. Research & Diagnostic Sys., Inc.*,
    665 F.3d 1269 (Fed. Cir. 2012) ....................................................41

*Tas v. Beachy*,
    626 F. App'x 999 (Fed. Cir. 2015) ....................................................32

*TQ Delta, LLC v. CISCO Sys., Inc.*,
  942 F.3d 1352 (Fed. Cir. 2019) ........................................................24

*Trintec Indus., Inc. v. Top-U.S.A. Corp.*,
  295 F.3d 1292 (Fed. Cir. 2002) ........................................................55

*U.S. v. U.S. Gypsum Co.*,
  333 U.S. 364 (1948)...........................................................................25

*University Of Rochester v. G.D. Searle & Co., Inc.*,
  358 F.3d 916 (Fed. Cir. 2004) ..........................................................26

*Vanda Pharm. Inc. v. West-Ward Pharm. Int'l Ltd.*,
  887 F.3d 1117 (Fed. Cir. 2018) ..................................... 3, 19, 24, 33, 41, 51, 56

*Vas-Cath Inc. v. Mahurkar*,
  935 F.2d 1555 (Fed. Cir. 1991) ........................................................54

*WBIP, LLC v. Kohler Co.*,
  829 F.3d 1317 (Fed. Cir. 2016) ........................................................24

*In re Wright*,
  866 F.2d 422 (Fed. Cir. 1989) ..........................................................36

*Wyers v. Master Lock Co.*,
  616 F.3d 1231 (Fed. Cir. 2010) ........................................................23

*Yeda Research and Dev. Co. v. Abbott GMBH & Co.*,
  837 F.3d 1341 (Fed. Cir. 2016) ........................................................50

**Statutes**

35 U.S.C. § 112(a) ..............................................................................22

**Other Authorities**

MPEP § 608.01(p) (9th Ed., 2014) .......................................................31

MPEP § 2163(II)(A)(3)(b)...................................................................51

MPEP § 2173.05(i) .......................................................................43, 46

**Regulations**

37 C.F.R. § 1.111(a).................................................................52

37 C.F.R. § 1.115(a)-(b)...........................................................52

## STATEMENT OF RELATED CASES

This case involves the same Patent as in *Argentum Pharm. LLC v. Novartis Pharm. Corp.*, No. 2018-2273, 2020 WL 1944759 (Fed. Cir. Apr. 23, 2020), an appeal from an IPR decision.  The appellant in *Argentum* has filed a petition for a writ of certiorari in the U.S. Supreme Court, which as of this filing has not yet been ruled upon.  *Argentum Pharm. LLC v. Novartis Pharm. Corp.*, No. 20-779, Pet'r's Br. (Dec. 4, 2020).

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a), as does this Court under 28 U.S.C. § 1295(a)(1).  The district court issued its final judgment on September 11, 2020.  (Appx1–4.)

# INTRODUCTION

U.S. Pat. No. 9,187,405 claims methods for treating relapsing-remitting multiple sclerosis (RRMS) with the drug fingolimod "at a daily dosage of 0.5 mg, absent an immediately preceding loading dose regimen." An example in the specification expressly describes a human clinical trial demonstrating the use of "a daily dosage of 0.5 . . . mg" of fingolimod as a "treatment" for patients with "relapsing-remitting MS," received "initially" for a period and continuing thereafter if tolerated and the disease does not progress. After a four-day bench trial, the district court rejected appellant HEC's written description attacks on the Patent.

HEC fails to show any error—much less clear error—on appeal. Written description depends on whether the application "reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). Based on the specification read from the perspective of a person of ordinary skill in the art, the district court found that a person of skill would understand the specification to show the inventors had possession of the claimed invention.

**a.** **The 0.5 mg Daily Dosage to Treat RRMS**. The district court found the specification supports the use of 0.5 mg of fingolimod to treat RRMS. Novartis's experts testified that the human example identifies that dose as a treatment to a person of skill and, if more were needed, the specification as a whole tells a person

of skill "the invention is about treating RRMS." A well-accepted animal model of MS was used in another example. It is "complementary" to the human example with respect to the new lower dose. The animal example revealed that a dose "roughly 60% lower" than ever before thought possible to treat the disease inhibited relapses in the MS animal model; this "translated . . . to the 0.5 dose" disclosed for humans. The human example tells a person of skill that "the daily dosage of 0.5 mg is an effective treatment." The district court found that expert testimony confirmed these examples and other passages in the patent specification provide ample information to a person of skill to support the claimed method of using 0.5 mg fingolimod daily to treat RRMS.

###### b.    The Absence of an Immediately Preceding Loading Dose Regimen.

The district court found the specification likewise supports the absence of a loading dose. The parties agree that a loading dose is a "higher-than-daily" dose given at the beginning of treatment. But the human example "describes giving a 'daily dosage of 0.5 . . . mg' fingolimod to treat RRMS, started 'initially.'" As Novartis's experts confirmed, this tells a person of skill "that on day 1, treatment begins with a daily dose of 0.5 mg, not with a loading dose. If a loading dose were directed, the Patent would say that a loading dose should be administered 'initially.'" These findings— ignored by HEC on appeal—show a person of skill would read the specification to exclude a loading dose.

2

HEC simply failed to provide pertinent expert testimony. For this reason and others, HEC failed to carry its burden on invalidity. Here, there is no dispute that a person of skill is a team consisting of an MS physician and a pharmacologist. Novartis provided testimony from each as to how a person of skill would read the specification to disclose the claimed methods. The district court found HEC's physician-witness unqualified to testify about human clinical trial design. The witness accordingly refused to testify at trial about the Patent's human example—testimony essential for HEC to question the disclosure's sufficiency. With that failure of proof, the district court rightly credited Novartis's witnesses, and "the court's decision to credit the plausible testimony of certain witnesses and reject the testimony of [others] . . . 'can virtually never be clear error[.]'" *Vanda Pharm. Inc. v. West-Ward Pharm. Int'l Ltd.*, 887 F.3d 1117, 1131 (Fed. Cir. 2018) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985)).

With attorney argument, HEC now contends that the district court's decision to credit the expert testimony below was impermissible gap-filling of an allegedly insufficient specification. But the evidence shows otherwise, and HEC's "arguments of counsel cannot take the place of evidence lacking in the record." *Estee Lauder, Inc. v. L'Oreal, S.A.*, 129 F.3d 588, 595 (Fed. Cir. 1997) (quoting *Knorr v. Pearson*, 671 F.2d 1368, 1373 (C.C.P.A. 1982)). Expert

testimony provided the district court with the perspective of the person of skill's understanding of the specification.

As the district court found, the specification tells a person of skill that the inventors had discovered and possessed 0.5 mg of fingolimod daily as a treatment for RRMS, making clear that the treatment was absent an immediately preceding loading dose regimen. HEC ignores key district court findings, points to no clear error, and ultimately failed to carry its burden below to show by clear and convincing evidence that the specification does not support the claims. This Court should affirm.

## STATEMENT OF ISSUES

Did the district court clearly err in finding that HEC failed to meet its burden of proving that the '405 Patent's specification lacked written description support for methods of treating RRMS with fingolimod:

1.      "at a daily dosage of 0.5 mg"; and

2.      "absent an immediately preceding loading dose regimen"?

## STATEMENT OF THE CASE

### A.     The Invention and the '405 Patent

Novartis's Gilenya® RRMS medicine uses the 0.5 mg daily dose of fingolimod claimed in the '405 Patent.  Inventors Peter Hiestand and Christian Schnell discovered that dose in early 2006, as part of a broader set of discoveries involving the drug's mechanism of action.

### 1.     Fingolimod as of June 2006

Researchers first discovered fingolimod (also called FTY720) as an immunosuppressant in the 1990s.  (Appx23318 (Steinman Tr. 740:2–21).)  By 1998, researchers had learned that fingolimod trapped lymphocytes in the lymph nodes, thereby reducing damage to tissues from an immune response.  (Appx24306 (Chiba 1); Appx23281–23282 (Steinman Tr. 703:14–704:22).)  The drug trapped lymphocytes by modulating the sphingosine-1 phosphate (S1P) receptor on those cells.  (Appx23279–23281 (Steinman Tr. 701:7–703:12).)

Novartis initially tested fingolimod as a therapy to prevent kidney transplant rejection.  (Appx22700–22701 (Lublin Tr. 122:17–123:15).)  The drug also held promise for RRMS, an autoimmune disease in which the patient's lymphocytes attack the central nervous system.  (Appx23282–23284 (Steinman Tr. 704:24–706:6); Appx22696 (Lublin Tr. 118:7–18).)

In 2005, Novartis reported the results of a Phase II clinical trial that tested 5.0 mg and 1.25 mg daily doses in RRMS patients.  (Appx22692, Appx22702–22704

(Lublin Tr. 114:17–23, 124:23–125:23, 126:14–126:21).)  Both doses were found to be equally effective in treating the disease.  (Appx23450–23451 (Jusko Tr. 872:11–873:1).)  In early 2006, Novartis announced plans for a Phase III clinical trial to test the 1.25 mg dose from the Phase II trial plus a previously untested 0.5 mg dose.  (Appx22693–22694 (Lublin Tr. 115:5–116:4).)

### 2.    The Inventors' Discovery of Lower Dose Treatment

Separately, in late 2005 and early 2006, Hiestand and Schnell were investigating fingolimod's mechanism of action in animals in the context of treatments for RRMS.  Where previous studies had focused on fingolimod's ability to trap lymphocytes in lymphatic tissue, the inventors here were the first to study fingolimod's ability to inhibit new blood vessel growth, or "neo-angiogenesis," as a potential mechanism in treating MS.  (Appx22694–22695 (Lublin Tr. 116:25–117:8); Appx23436 (Jusko Tr. 858:5–18).)

Their research used an Experimental Autoimmune Encephalomyelitis (EAE) model, the dominant animal system for studying MS.  (Appx23217 (Hoffman Tr. 639:10–12); Appx23354 (Steinman Tr. 776:10–13); Appx23444, Appx23453, Appx23505 (Jusko Tr. 866:10–16, 875:14–17, 927:7–11); Appx24399 (Steinman and Zamvil 1)).)  The inventors induced EAE in rats, administered 0.3 mg/kg of fingolimod on varying dosing schedules (daily, every other day, etc.), and tracked the disease's progression.  (Appx24560 (Angiogenesis Report 6); Appx23320–

23322 (Steinman Tr. 742:6–744:12).)  They discovered fingolimod inhibited neo-angiogenesis along with the disease's symptoms.  (Appx24560.)

The inventors further examined how different doses affected EAE's different phases:  the initial "acute" disability phase, followed by a period of "remission," followed by a disability "relapse."  They discovered "FTY720 blocked relapse formation when given at a dose of 0.3 mg/kg p.o. . . . even when given only once a week."  (Appx24560 (Angiogenesis Report 6).)  As discussed below (at 16–17, 33–34), that equated to a far lower daily dose than had ever been shown to work in the EAE model.

Hiestand conceived of the lower human dose "right after the experiment[.]"  (Appx22900 (Hiestand Tr. 322:3–19).)  He compared his results with doses previously known to work in animals and humans to arrive at the 0.5 mg human dose.  (Appx22897–22899, Appx22903–22905 (319:9–321:18, 325:19–327:13).)  Hiestand and Schnell were thus "the first ones to provide proof that [fingolimod] will work at 0.5 mg, which, of course, was not known at the time to the persons arranging Phase III trials."  (Appx22910 (332:8–17); *see also* Appx23310–23311 (Steinman Tr. 732:14–733:13 ("And they looked at varying the dose, something we just talked about. And they discovered a dose lower than anyone had ever seen[.]")); Appx23448–23450 (Jusko Tr. 870:11–872:9 ("[T]he inventors had performed these innovative experiments [and] . . . found a much lower dose to be effective[.]")).)

### 3.     The '405 Patent

Novartis filed a patent application in Great Britain on June 27, 2006 (Appx24734 ('405 Patent (60))); filed the identical application in the U.S. on June 25, 2007 (Appx23768–23788 ('765 Application File History 167–187)); and thereafter prosecuted that application or continuations without any substantive changes to the specification (*compare* Appx23747–23767 ('765 Application File History 146–166) *with* Appx24734–24742 ('405 Patent)).

*a.     The Specification's Focus on Using Fingolimod to Treat MS, Including RRMS.*   The specification focuses on using "S1P receptor modulators . . . for the *treatment or prevention* of neo-angiogenesis associated with . . . multiple sclerosis." (Appx24734 (Abstract) (emphasis added).)    Within the specification, "[a] particularly preferred S1P receptor agonist is . . . FTY720." (Appx24739 (8:18–19).) FTY720 is fingolimod. (Appx23278–23279 (Steinman Tr. 700:25–701:6); *see also* Appx24740 (10:22–24, 10:64–67) (discussing FTY720).)

After describing the chemical structure of S1P receptor modulators, the rest of the specification describes how to use those drugs to treat MS and related diseases. The specification describes MS "as an immune-mediated disease of the central nervous system with chronic inflammatory demyelination leading to progressive decline of motor and sensory functions and permanent disability." (Appx24739 (8:61–64).)  Therapy "is only partially effective," creating "a need for agents which

9

are effective in the inhibition or treatment of . . . multiple sclerosis . . . , including reduction of, alleviation of, stabilization of or relief from symptoms which affect the organism." (Appx24739–24740 (8:61–9:5).) Thereafter, the specification discusses MS and its treatment at length (Appx24740 (9:13–10:16)), disclosing methods for "treating," "alleviating," and "slowing progression" of MS and/or the symptoms of MS at "therapeutically effective" amounts, concluding that "S1P receptor modulators . . . may be useful in the treatment of one or more of [RRMS]" or other forms of MS (Appx24740 (10:17–20)).

    *b.*    *The Specification's EAE Animal and RRMS Human Examples*. Next, the specification addresses the "[u]tility of . . . S1P receptor modulators . . . in preventing or treating neo-angiogenesis associated with a demyelinating disease," as "demonstrated in animal test methods as well as in clinic, for example in accordance with the methods hereinafter described." (Appx24740 (10:25–31).)

    The specification then describes an example using the well-accepted animal model of "relapsing experimental autoimmune encephalomyelitis (EAE)." (Appx24740–24741 (10:33–11:2).) The inventors used polymer casts to assess neo-angiogenesis and found that "Compound A"—fingolimod (Appx24739 (8:17–22))—"fully blocks disease-associated neo-angiogenesis and completely inhibits the relapse phases when administered daily" at low doses (Appx24740 (10:64–67.) In addition, Compound A "completely inhibits the relapse phases when administered

daily at a dose of 0.3 mg/kg p.o.  The same effect is obtained when Compound A

. . . is administered p.o. . . . once a week."  (Appx24740–24741 (10:32–11:2).)

Next, a prophetic human "clinical trial" example shows an "[i]nvestigation of

clinical benefit of . . . Compound A" in "20 patients with relapsing-remitting

MS . . . at a daily dosage of 0.5, 1.25, or 2.5 mg p.o."  Patients' clinical states are

"investigated weekly by physical and laboratory examination" and "[d]isease state

and changes in disease progression are assessed every 2 months by . . . MRI . . . and

physical examination."  The patients "initially . . . receive treatment for 2 to 6

months" and then "remain on treatment for as long as their disease does not progress

and the drug is satisfactorily tolerated."  (Appx24741 (11:3–16).)

    *c.*    *Prosecution and Issued Claims.*  As prosecution unfolded, different

aspects of the invention were separated, and claims were narrowed.  In the parent

application, these included a method of treating aspects of MS with 0.5 mg daily of

fingolimod, as set forth in the human example.  (Appx24741 (11:4–19).)  The

Examiner initially rejected these claims in the parent application in view of a prior

loading dose publication (Appx23914–23916, Appx24069–24074 ('468 Application

File History 109–111, 264–269)), but later accepted amended claims that expressly

exclude loading doses (Appx23890).  Then, similar amendments were made the

claims of the application that later issued as the '405 Patent.  The Examiner allowed

the claims. (Appx25260, Appx25339–25343, Appx25403–25404, Appx25417 ('405 Patent File History 64, 143–147, 207–208, 221).)

Independent claim 3 recites "a method for treating [RRMS] in a subject in need thereof, comprising orally administering to a subject [fingolimod] . . . at a daily dosage of 0.5 mg, absent an immediately preceding loading dose regimen." Independent claims 1 and 5 recite subsets of "treating"; either "reducing or preventing or alleviating relapses" or "slowing progression" of RRMS.[1] Dependent claims 2, 4, and 6 each specify fingolimod hydrochloride as the treating compound. (Appx24741–24742 (12:49–13:9).)

## B.    The Patent Surmounts Multiple Invalidity Challenges

### 1.    Pre-Trial

*The IPR.*  In 2017, the Patent was challenged in an IPR. An anticipation ground in the IPR Petition relied on an underlying theory of inadequate written description support for the absence of a loading dose, similar to the argument HEC

---

[1] Claim 3 is to a "method of treating" RRMS "consisting of administering" fingolimod "at a daily dosage of 0.5 mg[.]" (Appx24741 (12:59–64).) Claims 1 and 5 are the same except for their preambles, which describe subsets of "treatment": "reducing or preventing or alleviating relapses" (Appx24741 (12:49–55)) or "slowing progression" of RRMS (Appx24742 (13:1–6)). The Patent identifies these "treatment" subsets at Appx24740 (9:32–47) (describing methods "for reducing or preventing or alleviating relapses" and "slowing progression" of diseases that include MS). In the IPR, the Patent Office accordingly found Claims 3 and 5 to be particular species of "treating" RRMS. (Appx221–222 (IPR Final Written Decision).) HEC does not argue otherwise.

makes here.    The Patent Office rejected all challenges and upheld the Patent.
(Appx209 (IPR Final Written Decision).)    On appeal, two petitioners settled before
and one after oral argument (*Argentum Pharm. LLC v. Novartis Pharm. Corp.*, No.
2018-2209 (Fed. Cir.), Dkt. 74, 125, 134), and the last was dismissed for lack of
Article III standing.    *Argentum Pharm. LLC v. Novartis Pharm. Corp.*, 956 F.3d
1374 (Fed. Cir. 2020).

*The Preliminary Injunction*.    Immediately after the IPR decision, Novartis
asserted the Patent in Delaware District Court against more than 20 companies that
had filed ANDAs for Gilenya.[2]    (Appx143–197.)    Chief Judge Stark presided.    The
Hatch-Waxman 30-month stay did not apply, so Novartis sought a preliminary
injunction to prevent a launch-at-risk.    In opposing, the defendants (including HEC)
challenged the Patent's validity on multiple grounds, including anticipation by

---

[2] HEC contends (Br. 23) that Novartis delayed in asserting the Patent below.  Chief
Judge Stark rejected that argument in granting the PI.  (Appx18864.)  The timing
of the suit is irrelevant to the Patent's validity.  Equally irrelevant (and wrong) is
HEC's assertion (Br. 23) that "[r]ecord evidence reveals Novartis believed the
'405 patent invalid."  The "evidence" HEC cites is an email from the PI record
that was never entered into evidence at trial, for which no foundation was laid,
and which is accordingly not proper "record evidence" under FRCP 65.  The
email merely acknowledged the existence of the IPR Petition and thus the risk
that the PTAB could invalidate the claims.  And considering that email, Judge
Stark found in granting the PI that "I'm not persuaded that Novartis believes the
'405 patent is invalid, or that this belief somehow explains how Novartis has
approached litigating the '405 patent[.]" (Appx18864.)

Kappos 2006 (a 2006 abstract announcing the upcoming Phase III RRMS trial of 1.25 and 0.5 mg daily) and lack of written description.

The court granted the injunction after an in-person evidentiary hearing. (Appx18857–18865 (PI Order).)  Chief Judge Stark found that "defendants are not at all likely to prevail at trial on invalidity." (Appx18858–18859.)  With respect to written description, a person of skill "would read the '405 patent to have an adequate written description." (Appx18861.)  In other words, "as the Patent Office similarly found, that when read in its full context, a person of skill does understand the [P]atent to preclude a loading dose." (Appx18862.)

No defendant appealed the PI decision.

### 2.    Trial

After the PI and before trial, all defendants except HEC settled.  Judge Kent Jordan from the Third Circuit tried the case by designation.  Over the four-day trial, HEC contested infringement and validity.  (Appx7.)  Each side presented live testimony from three experts, plus deposition testimony from fact witnesses. (Appx12–19 (¶¶ 13–36).)

On written description, Novartis's physician experts Drs. Larry Steinman and Fred Lublin and expert pharmacologist Dr. William Jusko testified that the human example tells a person of skill that the 0.5 mg daily dose "will work for treatment" of RRMS.    (Appx23331–23332 (Steinman Tr. 753:22–754:10); *see also*

Appx22820–22821 (Lublin Tr. 242:22–243:20), Appx23441–23442 (Jusko Tr. 863:24–864:18).) A person of skill would understand the animal example to further support the claims. (Appx23440–23444, Appx23448–23449 (Jusko Tr. 862:1–863:21, 864:19–866:16, 870:20–871:3).) And, lastly, the human example and the patent as a whole tell a person of skill to exclude a loading dose from the claimed therapy. (Appx23334–23335 (Steinman Tr. 756:16–25, 757:1–8); *see also* Appx22791–22793 (Lublin Tr. 213:6–15, 215:5–11).)

HEC failed to provide evidence that a person of skill would read the human example any differently. HEC sought to have its physician witness Dr. Paul Hoffman testify on the subject, but the court declined to acknowledge him as an expert in human clinical trial design (HEC has not appealed this ruling). (Appx23105–23106, Appx23108–23110 (Hoffman Tr. 527:5–528:11, 530:23–532:2).) Dr. Hoffman then refused on direct to address the human example at all; when questioned by HEC's counsel, he testified that "maybe I shouldn't comment on that, because you want to hear what an expert would say about that." (Appx23117 (539:11–21).) With HEC unable to present that evidence, the only expert testimony on the perspective of a full person of skill came from Novartis.

### 3.    The Trial Decision

The district court concluded that "HEC is liable for contributory and induced infringement" and that "the Patent is not invalid." (Appx7.)

The court applied *Ariad* to evaluate written description, assessing what the specification "reasonably conveys to those skilled in the art" based on "an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." (Appx36 (¶¶ 20–21) (quoting *Ariad*, 598 F.3d at 1351).) The court concluded that "[t]he Patent here provides a sufficient written description of the invention such that a person of ordinary skill would know that the inventors were in possession of the invention." (Appx37 (¶ 24).) In reaching that conclusion, the court made numerous findings of fact based on the expert testimony and other evidence.

The 0.5 mg daily dose treatment. The court found that a "person of skill would understand the" human example "to disclose a method of treatment because it specifies that the purpose of the daily dose is treatment and describes how a person of skill would follow a patient for that treatment." (Appx22 (¶ 50).) The court credited Dr. Lublin's testimony that the human example "provides anticipated results from treatment." (Appx22–23 (¶¶ 50–51).) "Read as a whole, the Patent tells a" person of skill "that the invention is about treating RRMS," and, as Dr. Lublin testified, the animal and human examples are "complementary" in supporting the invention. (Appx23 (¶¶ 52–53).)

The court further credited that a person of skill would read the animal example to show that doses 60% lower than previously reported in the EAE literature would

work.    (Appx23–25 (¶¶ 54–58).)    Consequently, "[a] person of skill would understand that the EAE results . . . demonstrate that a proportionally lower dose (again, roughly 60% lower) could be effective in humans," and "[a] 60% lower dose is the 0.5 mg dose described in the Patent."  (Appx25 (¶ 58).)  The court further found that the human example "would confirm to a person of skill that the inventors did a translation of their EAE experiments to the 0.5 mg daily dose in humans, as exemplified in the Patent."  (Appx25–26 (¶ 59); *see also id.* ("Dr. Steinman agrees that  person of ordinary skill in the art would understand that the inventors translated the lowest dose that had ever been seen as effective from their EAE experiment (0.3 mg/kg once per week) to the 0.5 mg dose.").)  Accordingly, "[a] person of skill would understand that the inventors were in possession of the claimed method[.]" (Appx26 (¶ 60).)

The loading dose.  The court explained that the human example "describes giving a 'daily dosage of . . . 0.5 mg' fingolimod to treat RRMS, started 'initially.'" (Appx26 (¶ 62).)  Based on the experts' testimony, the court found that this passage "tells a person of skill that on day 1, treatment begins with a daily dose of 0.5 mg, not a loading dose.  If a loading dose were directed, the Patent would say that a loading dose should be administered 'initially.'"  (*Id.* (internal citations omitted).) The court further found that "[a] loading dose is necessarily a higher-than-daily

dose," and "starting with a daily dose plainly implies that there is no loading dose." (Appx27 (¶ 63).)

Other evidence was in accord, including that the human example "describes the dosing regimen (dosage, frequency, and length) and does not involve a loading dose" (Appx26 (¶ 61)); the animal example "discloses a dosing regimen which does not involve a loading dose" (Appx27 (¶ 64)); the "Patent describes alternative dosing regimens, like 'intermittent dosing,' but does not describe loading doses" (Appx27 (¶ 65)); and a "person of skill in 2006 would not expect a loading dose to be used to treat RRMS with fingolimod," as HEC's expert Dr. Hoffman had testified (Appx27 (¶ 66) (citing Appx23126–23127, Appx23129 (548:2–549:2, 551:6–12)); *see also* Appx23195 (617:18–23 (Dr. Hoffman admitting that Patent discusses intermittent dosing but "doesn't mention anything about a loading dose")); Appx23209–23211 (631:14–633:4 (Dr. Hoffman admitting that Patent talks about "[d]aily dosage" but "[i]t doesn't talk about a loading dose")).)

Based on these findings, the district court found that the '405 Patent "provides a sufficient written description of the invention such that a person of ordinary skill would know that the inventors were in possession of the invention." (Appx37 (¶ 24.) The court further found that "when read as a whole, the Patent describes a daily dosage of 0.5 mg of fingolimod, without a preceding loading dose, to treat RRMS." (*Id.*) Finally, the court found that the Patent's examples together "demonstrate a

dosage of 0.5 mg per day," and "indicate to a person of ordinary skill that the claimed invention did not include the administration of a loading dose." (*Id.*)

In addition, the court rejected HEC's Kappos 2006 anticipation challenge. HEC had failed to show that Kappos 2006 was prior art, disclosed all claim elements, and was enabled.[3]  (Appx38–42 (¶¶ 25–38).)

## SUMMARY OF THE ARGUMENT

HEC appeals only as to written description.  The district court properly found that HEC failed to provide clear and convincing evidence of lack of written description.  As a threshold matter, HEC failed to provide the perspective of a full person of skill on the Patent's key example, which provided much of the specification's support for the claims.  The district court thus credited Novartis's experts, and its decision to do so "can virtually never be clear error[.]" *Vanda*, 887 F.3d at 1131 (quoting *Anderson*, 470 U.S. at 575).

Even apart from HEC's failure of proof, the district court's decision was correct, and certainly not clearly erroneous.  The human example explicitly describes a "daily dosage of 0.5 . . . mg" fingolimod as a "treatment" for RRMS, as recited in

---

[3]  After trial, HEC asked the district court for a partial stay of judgment and other relief, which was denied.  HEC then filed a putative emergency motion in this court for the same relief.  This Court granted the request "[w]ithout prejudicing the ultimate disposition of this case by a merits panel"—indeed, without addressing the merits at all.  (Dkt. 21 2–3.)

the claims. The animal example further reports actual results of a new low dose inhibiting a disease model in rats, the basis for the new low dose in the human example. The rest of the specification likewise describes the invention as a treatment for MS—including RRMS specifically—with a class of drugs that includes fingolimod, and indeed singles out fingolimod as a preferred compound.

The specification similarly supports the absence of "an immediately preceding loading dose regimen." A loading dose is a "higher-than-daily dose," but the human example describes giving 0.5 mg "daily." That treatment is given "initially"—from the outset—for 2 to 6 months. As the experts testified, these passages tell a person of skill not to use a loading dose regimen—there simply is no room for one with a "daily" dose provided "initially." Other parts of the specification and the knowledge of a person of skill further confirm the absence of a loading dose, and HEC failed to provide any testimony showing otherwise.

Lastly, HEC's contention that the district court's written description decision conflicts with its anticipation decision is wrong. Written description and anticipation are governed by different standards applied here to different types of documents with different contents, as the district court found. The district court was correct to accept the experts' understanding of these two documents as different, and was correct in its finding that the '405 Patent fully describes the claimed invention.

# ARGUMENT

The district court found that HEC failed to provide clear and convincing evidence to overcome the '405 Patent's presumption of validity. On appeal from a bench trial, whether a patent provides written description is a fact question reviewed for clear error. *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1308 (Fed. Cir. 2015). That means "the court's findings will not be overturned in the absence of a 'definite and firm conviction' that a mistake has been made." *Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d 1365, 1374 (Fed. Cir. 2008) (quoting *Pfizer, Inc. v. Teva Pharm. USA, Inc.*, 518 F.3d 1353, 1366 (Fed. Cir. 2008)).

"'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'" *Nalpropion Pharm., Inc. v. Actavis Labs. FL, Inc.*, 934 F.3d 1344, 1348 (Fed. Cir. 2019), *cert. denied sub nom.* 140 S. Ct. 2804 (2020) (quoting *Anderson*, 470 U.S. at 574). "Clear error review 'does not entitle this court to reverse the district court's finding simply because it would have decided the case differently.'" *Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 967 (Fed. Cir. 2006) (quoting *Miles Labs., Inc. v. Shandon Inc.*, 997 F.2d 870, 874 (Fed. Cir. 1993)). Rather, the Court "must uphold the trial court's determination if it is 'plausible in light of the entire record or where it chooses one of two permissible views of the evidence.'" *Id.* (quoting *Miles Labs., Inc.*, 997 F.2d at 874).

The district court's findings below are far more than merely "plausible" or "permissible"—HEC manifestly failed to produce clear and convincing evidence that the Patent lacks written description.

## I.   The District Court's Decision to Credit Novartis's Expert Testimony Was Correct, and Not Clear Error

Under *Ariad*, written description depends on whether the specification "reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." 598 F.3d at 1351. As the district court held, that "requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." (Appx37 (¶ 21) (quoting *Ariad*, 598 F.3d at 1351)); *see also* 35 U.S.C. § 112(a) (intended audience of patent is a "person skilled in the art to which it pertains").

HEC thus had to show by clear and convincing evidence that a person of skill would read the specification not to support the claims. HEC does not dispute that a person of skill here is a "multi-disciplinary research team" that "includes 1) . . . an M.D. having several years of clinical experience treating multiple sclerosis patients, and who would be knowledgeable about the multiple sclerosis literature, and 2) a pharmacologist with experience in drug development." (Appx11 (¶ 9) (internal citations omitted).) Among HEC's three expert witnesses, Dr. Fujinami (an EAE researcher) offered no opinion "related to the human example in the patent[.]" (Appx22995 (Fujinami Tr. 417:14–18).) Dr. Savic (a pharmacologist) testified only

about whether there was a sufficient link between the animal and human examples; not being a physician, Dr. Savic could not testify about whether a medical specialist would think the human example supports the claims. (Appx23072–23074 (494:23–496:20); Appx23085–23086 (508:5–13).)

For that, HEC sought to rely on Dr. Hoffman, an MS physician. But the district court found Dr. Hoffman unqualified to testify about clinical trial design. (*See supra* at 15.) As a result, when HEC's counsel asked him about the human example on direct, he responded that "maybe I shouldn't comment on that, because you want to hear what an expert would say about that." (Appx23117 (Hoffman Tr. 539:11–21).) Dr. Hoffman thus could only offer broad conclusory assertions that the specification did not support the claims. (Appx23115 (Hoffman Tr. 537:11–13) ("I feel like the Claims 1 through 6 of the patent are invalid for lack of written description.").) That is not enough.

Expert testimony was essential here to understand how a person of skill would read the human example. *See Wyers v. Master Lock Co.*, 616 F.3d 1231, 1240 n.5 (Fed. Cir. 2010) (quoting *Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1369–70 (Fed. Cir. 2004) (explaining that "'expert testimony'" can be "'essential,'

particularly in cases involving complex technology")).[4]  With nothing more than conclusory assertions from Dr. Hoffman, HEC failed to provide any substantial evidence of invalidity for written description—much less clear and convincing evidence.[5]  The district court was thus well within its rights to credit the testimony from Novartis's experts.  *Nalpropion*, 934 F.3d at 1350 ("The district court performed precisely its fact-finding function, weighing credibility of testimony."); *Vanda*, 887 F.3d at 1131.

Even HEC's lead case illustrates the need for expert testimony.  In *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1351 (Fed. Cir. 2012) (cited at Br. 41–42), this Court relied on expert testimony in assessing written description, in particular the support for a so-called "negative limitation."  The same sort of testimony is key here.  As HEC agrees (Br. 11), the field of MS treatment is "incredibly unpredictable."  Animal models, clinical trials, and developmental compounds made

---

[4] *See also Allergan, Inc. v. Barr Labs, Inc.*, 501 F. App'x 965, 971 (Fed. Cir. 2013) (same); *Proveris Scientific Corp. v. Innovasystems, Inc.*, 536 F.3d 1256, 1267 (Fed. Cir. 2008) (same).

[5] "'[G]eneral and conclusory testimony . . . does not suffice as substantial evidence of invalidity.'"  *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1339 (Fed. Cir. 2016).  If evidence attacking written description "fails to meet even the substantial evidence standard, it does not rise to the level of clear and convincing evidence[.]"  *Id.*; *see also TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1358–59 (Fed. Cir. 2019) ("Conclusory expert testimony does not qualify as substantial evidence.") (collecting authorities).

the area extremely complex in 2006.  HEC acknowledges that "[t]he district court made express findings that MS is an unpredictable disease, that studying it is difficult, that clinical trials often fail, and that there is simply no way to know in the beginning of a trial what the answer will be[.]" (Br. 28.)  Expert testimony confirms that fact.  (*See, e.g.*, Appx23427–23428 (Jusko Tr. 849:7–850:15) (describing "complex" pharmacology known in the art about fingolimod); Appx22694 (Lublin Tr. 116:5–24) (describing Phase III clinical trials as "very complicated"); Appx22717–22718 (Lublin Tr. 139:13–140:15) (describing immune system as "extremely complicated" in context of MS); Appx22757 (Lublin Tr. 179:5–20) ("MS clinical trials are complicated."); Appx23006 (Calabresi Tr. 428:4–15) (third party witness who advised on fingolimod clinical trials: "the design of a clinical trial is very complicated").)  This is exactly the sort of context when expert testimony is important to provide a person of skill's perspective.  (*See* cases cited *supra* at 23–24 n.4.)  With only one party having provided substantial testimony on the issue, the district court's decision to credit that testimony could not have been clear error.

Other cases HEC cites are not to the contrary.  HEC argues (Br. 38–39) that *U.S. v. U.S. Gypsum Co.*, 333 U.S. 364 (1948), allows the Court to give "little weight" to testimony inconsistent with documents; but as shown below (at 55–57), the testimony here is not inconsistent with any document.  *Nuvo Pharm. (Ireland) Designated Activity Co. v. Dr. Reddy's Labs, Inc.*, 923 F. 3d 1368, 1382 (Fed. Cir.

2019) (Br. 39), simply held that the expert testimony there was insufficiently connected to the patent's text, a problem not present here.  And while *University Of Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916, 923 (Fed. Cir. 2004) (Br. 39), notes that lack of written description *can* be found from the specification alone, the court did not hold that this is always or even frequently appropriate.  There, the patentee's expert failed "to point to any language in the patent supporting [their] opinions."  *Id.* at 919.  That is the opposite of this case.

HEC's attack on the expert testimony below should thus be seen for what it is—a cover for HEC's own evidentiary failures.  This threshold issue permeates all of HEC's arguments, and defeats HEC's effort to impugn the district court's decision to credit the testimony of Novartis's witnesses.  HEC may disagree with that decision, but "mere disagreement with the court's factual findings . . . cannot serve as a basis for reversing the court[.]" *In re Omeprazole Pat. Litig.*, 281 F. App'x 974, 979 (Fed. Cir. 2008).

HEC consequently is left to argue that the specification standing alone must be read not to support the claims—notwithstanding that the Patent's disclosures and the only testimony of a person of skill in the record say the opposite.  As shown in the district court's opinion, the testimony from Novartis's experts was firmly grounded in the specification's language, and the district court "credited Novartis's expert testimony on how a person of ordinary skill would understand such

disclosures." (Appx26200 (Post-Trial Opinion Denying HEC's Motion to Stay Judgment).) There is no basis to find clear error in the district court's reliance on that testimony.

## II.    The Specification Describes the Use of 0.5 mg Fingolimod to Treat MS

The specification contains multiple sources of support for the claim to using 0.5 mg fingolimod to treat RRMS. The human example alone should suffice for that purpose, as it describes using 0.5 mg of fingolimod as a "treatment" for RRMS. If more were needed—and it is not—the Patent as a whole describes the invention as a treatment for MS, including RRMS, and the animal example provides data a person of skill would have understood to support the claims.

### A.    The Claims Track the Patent's Human Example

The human example describes the claimed use of 0.5 mg daily to treat RRMS in literal terms. HEC pretends the specification buries the human example in a vast sea of possible dosing regimens, but that is simply not true. And while HEC complains that the human example is merely "hypothetical," prophetic examples like this one have long been held sufficient to provide written description.

#### 1.    The Human Example Describes the Same Drug, at the Same Dose, to Treat the Same Condition as in the Claims

The district court found that the human example supports the claim language (Appx21–22 (¶ 49)): as the specification says, "patients with relapsing-remitting MS receive said compound [Compound A] at a daily dosage of 0.5, 1.25, or 2.5 mg

p.o [orally]" as a "treatment" (Appx24741 (11:8–16)).  Compound A is fingolimod. (Appx24739 (8:17–30).)  The experts confirmed that a person of skill would read this example to track the claims.    (Appx23314–23315, Appx23331–23334 (Steinman Tr. 736:24–737:8, 753:5–756:15); Appx22750–22753, Appx22791–22793   (Lublin Tr. 172:10–174:9, 175:13–20, 213:1–215:15).)    This literal description of using the 0.5 mg daily dose to treat RRMS shows that the inventors had possession of the claimed invention—that is, that they invented what they claimed to have invented.  *See Ariad,* 598 F.3d at 134 (written description is to "allow persons of ordinary skill in the art to recognize that the inventor invented what is claimed.").  HEC produced no evidence to the contrary.

The patents in HEC's cases (Br. 54–55) lacked such literal disclosure.  In HEC's lead case on this claim element, *L.A. Biomedical Research Inst. at Harbor-UCLA Med. Ctr. v. Eli Lilly & Co.*, 849 F.3d 1049 (Fed. Cir. 2017), the priority application did not disclose the claimed dose at all, so a person of skill had to make assumptions based on the prior art—including at least one assumption as to which the patentee presented no evidence.  *Id.* at 1057–58; *see also Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997) (no literal disclosure of claimed terminal with video disk player); *Idenix Pharm. LLC v. Gilead Sciences, Inc.*, 941 F.3d 1149, 1164 (Fed. Cir. 2019) (claims broader than specification's examples).

Here, the literal disclosure of 0.5 mg daily to treat RRMS provides written description.

### 2.    No "Blaze Marks" Are Needed to Find the Human Example's Support for the Claims

In the face of this literal support, HEC tries to muddy the waters by repeatedly asserting (*e.g.*, Br. 10, 14, 17, 30–31, 59) that the specification covers a "broad class of S1P receptor modulators" at "an enormous range of possible dosing regimens" for general "demyelinating disease." HEC even asserts that "*the only* specific dosing of fingolimod indicates that 'Compound A [fingolimod] may alternatively be administered intermittently, e.g. at a dose of 0.5 to 3 mg every other day or once a week.'" (Br. 59 (emphasis added).) HEC is wrong. As discussed above at 10–11 and 27–28, the human example describes giving 0.5 mg and two other specific daily doses of fingolimod—"Compound A"—as a treatment for RRMS. That is what is claimed.

These mischaracterizations underpin HEC's "blaze marks" argument (Br. 57–58). That doctrine applies where a specification describes "a large genus" and the claims recite "particular species or subgenuses." *Fujikawa v. Wattanasin*, 93 F.3d 1559, 1571 (Fed. Cir. 1996); *see also e.g., Application of Ruschig*, 379 F.2d 990, 993 (C.C.P.A. 1967) ("the application encompasse[d] something like half a million possible compounds"); *FWP IP APS v. Biogen MA, Inc.*, 749 F. App'x 969, 973–74 n. 5 (Fed. Cir. 2018) (the patent contained only "laundry-list disclosures"); *Purdue*

*Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1326–27 (Fed. Cir. 2000) (the patent disclosed a "multitude of pharmacokinetic parameters"). The claimed 0.5 mg daily dose of fingolimod administered orally is one of just *three* specifically recited dosage regimens identified for "treatment" of RRMS. As discussed above at 9–10, the rest of the specification focuses on the use of a class of S1P receptor modulators, including fingolimod, to treat MS, including RRMS. Fingolimod is uniquely highlighted throughout the specification, including as a "particularly preferred" compound. (Appx24739 (8:17–30); *see also* Appx24740–24741 (10:22–24; 10:64–67; 11:6–16).) Indeed, no other compound is called out by name. Again, HEC failed to produce any proof—much less clear and convincing evidence—that a person of skill would have any trouble identifying the 0.5 mg dose in the human example, or fingolimod as the Patent's featured compound.

HEC also suggests (Br. 59) that the specification "leads away" from the claimed dose, an argument HEC never made below (and thus waived).[6] The specification does the opposite. It progresses logically through descriptions of how the invention can be used to treat RRMS at "therapeutically effective doses" (Appx24740 (9:13–10:20)), and then culminates in the human example specifically

---

[6] *See Fresenius USA, Inc. v. Baxter Intern., Inc.*, 582 F.3d 1288, 1295–96 (Fed. Cir. 2009) ("If a party fails to raise an argument before the trial court, or presents only a skeletal or undeveloped argument to the trial court, we may deem that argument waived on appeal[.]").

identifying the 0.5 mg dose as a treatment.  There is no leading away, and HEC produced no evidence that a person of skill would have been led away by the specification.

### 3. The Human Prophetic Example Suffices for Written Description

The human example is prophetic, a type of example "routinely used in the chemical arts" that "certainly can be sufficient to satisfy the written description requirement."  *Ariad*, 598 F.3d at 1357; *see also Hoffmann-La Roche, Inc. v. Promega Corp.*, 323 F.3d 1354, 1377 (Fed. Cir. 2003) ("[Paper] examples have long been accepted in patent documents . . . . The patent law authorizes that an invention may be constructively reduced to practice by filing a patent application, whether the embodiments were actually made or are constructed in the patent application."); MPEP § 608.01(p) (9th Ed., 2014) ("[P]rophetical examples (paper examples) are permitted in patent applications.").

Nonetheless, HEC repeatedly attacks the human example as "hypothetical" (*e.g.*, Br. 31, 32, 48); lacking in actual clinical trial data (*e.g.*, Br. 48, 50, 60); and "silent as to . . . effectiveness" or "anticipated or predicted results" (*e.g.*, Br. 6).  All prophetic examples are hypothetical to some extent, so that characterization is

31

irrelevant. Likewise, the law requires no clinical trial data in a treatment patent[7]—

or any data at all, for that matter, to satisfy the written description requirement.[8] At

any rate, the specification here contains animal results supporting the claims, as

shown below (at 38–43). Animal data has long been held to be sufficient to support

claims to a human therapy.[9]

Thus, regardless of the human example's prophetic nature, the district court

credited the unrebutted testimony from Novartis's experts that a person of skill

would read the example to disclose "an effective treatment" and a "a method of

treatment"; the example "specifies that the purpose of the daily dose is treatment and

describes how a person of skill would follow a patient for that treatment." (Appx22

---

[7] *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1308–09 (Fed. Cir. 2015) (no case requires a patentee to include clinical data); *In re '318 Patent Infringement Litig.*, 583 F.3d 1317, 1324 (Fed. Cir. 2009) ("[H]uman trials are not required for a therapeutic invention to be patentable.").

[8] *See, e.g.*, *Nuvo*, 923 F.3d at 1380 ("our [written description] case law does not require experimental data demonstrating effectiveness") (citations omitted); *Alcon Res. Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1190 (Fed. Cir. 2014) (for written description, "[t]here is no requirement that the disclosure contain 'either examples or an actual reduction to practice'") (quoting *Ariad*, 598 F.3d at 1352).

[9] *See, e.g.*, *Tas v. Beachy*, 626 F. App'x 999, 1006 (Fed. Cir. 2015) (rejecting written description challenge to claims to treating cancer in humans, where challenger argued that "descriptions of mice grafted with foreign tumor cells does not provide written description or enablement support"); *Pfizer Inc. v. Watson Pharm., Inc.*, 920 F. Supp. 2d 552, 563–64 (D. Del. 2013) (rejecting written description challenge where patent disclosed effective "rapamycin administration in dogs, rats, and pigs, with adverse events in dogs and pigs").

(¶ 50); *see also* Appx21 (¶ 49).)  In particular, Dr. Lublin explained that the human example "discloses a treatment purpose because subjects 'initially . . . received treatment for two to six months' and then 'remain on treatment for as long as their disease does not progress[.]'"  (Appx22 (¶ 50) (citing Appx24741 (11:13–14); Appx22811–22813 (Lublin Tr. 233:23–235:5)).)  The district court further found that although the human example "was not actually conducted, it provides anticipated results from treatment."  (Appx22 (¶ 51).)

Expert testimony was important to understand the example's description of "treatment" and "progression" and the techniques used to assess each.  When Dr. Hoffman declined to testify about the human example, HEC was unable to provide any proof of its theory that the example was unduly hypothetical.  And even if HEC's experts had testified to that issue, the district court was entitled to credit Novartis's experts' testimony.  *Nalpropion*, 934 F.3d at 1350; *Vanda*, 887 F.3d at 1131.

Notwithstanding these findings, HEC contends (Br. 48–52) a person of skill would not have expected the 0.5 mg dose to work in June 2006, so the specification had to do more.  HEC points to *Nuvo*, 923 F.3d at 1381, but *Nuvo* is inapposite.  Unlike the patents in *Nuvo*—which included no data—the '405 Patent discloses data using fingolimod in low doses in the well-accepted EAE animal model that unexpectedly "fully blocks disease-associated neo-angiogenesis and completely inhibits the relapse phases" (Appx24740 (10:61–64).  Those EAE doses correspond

to human doses as the experts explained and the district court credited.  It is self-evident to a person of skill that the EAE results form the support or rationale as to why the claimed invention is possessed by the inventors.  The EAE data are read in concert with the prophetic human example that puts into practice (constructively) what the results showed in the well-accepted EAE model of human disease. Requiring more, such as actual human clinical trial data, would be in conflict with well-settled law that experimental data are not required to support method of treatment claims.  *See Nuvo*, 923 F.3d at 1380 ("our case law does not require experimental data demonstrating effectiveness"); *see also Allergan*, 763 F.3d at 1309.

In any event, this argument sounds more like enablement than written description, and HEC made no enablement challenge.  *See Centrak, Inc. v. Sonitor Techs., Inc.*, 915 F.3d 1360, 1366 (Fed. Cir. 2019) (written description is "not about whether the patentee has proven to the skilled reader that the invention works, or how to make it work, which is an enablement issue") (quoting *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1191 (Fed. Cir. 2014)).  Nor could HEC make an enablement argument.  The inventors provided animal data showing a lower dose than ever before working to treat the disease.  That 0.5 mg dose had been tested in transplant patients albeit with loading doses (contrary to HEC's assertion (*e.g.*, Br.

12, 49) that the 0.5 mg dose had never been given to humans before),[10] and had begun to be tested in the Phase III RRMS trial by June 2006. (Appx22692–22693 (Lublin Tr. 114:14–115:21).) HEC's own experts accordingly testified extensively about why a person of skill would have thought in June 2006 that the 0.5 mg daily dose would be an effective treatment. (Appx23136–23138 (Hoffman Tr. 558:22–560:11); Appx23078–23079 (Savic Tr. 500:4–501:23).)

The dispute in *Nuvo* involved claims to an effective drug composition with a specification that said only that the composition "might" work, when a person of skill at the time would have thought the composition would not work. 923 F.3d at 1380–81, 1384. *Nuvo* is thus also inapposite because here, efficacy is not part of the claims. Defendants prevailed in excluding efficacy during claim construction. (Appx18666–18670 (Markman Opinion).) The '405 Patent claims were deemed to require only a treatment purpose (*id*. at Appx18670); the specification expressly describes a "treatment" repeatedly throughout; and the unrebutted expert testimony showed that the human example described giving 0.5 mg daily for a treatment purpose.[11]

_____

[10] (Appx24769–24771 (Kahan); Appx23457–23458 (Jusko Tr. 879:12–880:1).)

[11] To be sure, a doctor's belief the drug worked would inform whether to give the drug to treat RRMS, as Dr. Lublin explained at trial. (Appx22754–22755 (176:14–177:14).) But that does not turn efficacy into a claim limitation, as the

### B.    The Specification as a Whole Further Supports the Claims

The district court correctly found that, in addition to the human example, the specification "[r]ead as a whole" further supports the claims.  (Appx23 (¶ 52); Appx37 (¶ 24).)  It is well established that in deciding written description, "the specification as a whole must be considered."  *In re Wright*, 866 F.2d 422, 425 (Fed. Cir. 1989).

### 1.    The Specification Focuses on Using Fingolimod to Treat RRMS

The district court found the Patent as a whole tells a person of ordinary skill in the art that "the invention is about treating RRMS."  (Appx23 (¶ 52).)  That is clearly correct—even before reaching the examples, the Patent contains multiple columns explaining how the invention is about treating MS, including RRMS, with therapeutically effective amounts of S1P receptor modulators, with fingolimod being the "particularly preferred" compound.  (*See supra* at 9–10.)

Nonetheless, HEC asserts without citation (Br. 6) that the specification is "directed" to "other forms of MS (not RRMS)" and "general S1P receptor modulators (not even fingolimod)[.]"  But HEC's own expert Dr. Hoffman admitted the opposite was true on cross-examination.  (Appx23196 (Hoffman Tr. 618:3–22)

---

district court found in claim construction (and HEC does not dispute). (Appx18666–18670 (Markman Opinion).)  And what matters here, as in *Nuvo*, is the match between the specification and what is actually claimed.

36

(agreeing that "RRMS is one of those types" of MS to which the patent applies); *see also* Appx23173–23175, Appx23178–23179, Appx23191–23195, Appx23197–23198 (Hoffman Tr. 595:19–596:1, 596:15–17, 597:2–10, 600:22–601:10, 613:7–617:11, 619:16–620:6).) RRMS is extensively discussed—including in the human example. (*See supra* at 9–11.) Fingolimod is "particularly preferred" and the only specific compound in the examples ("Compound A"). (Appx24739, Appx24740–24741 (8:17–30, 10:32–11:19).) The district court found that these other aspects of the specification support the claims. (Appx23 (¶¶ 52–53).)

To be sure, the specification and claims in the initial application also addressed other forms of MS, and other compounds beside fingolimod. But that does not undercut the district court's findings. Whatever else is covered, the specification specifically and repeatedly discusses RRMS and fingolimod. All of that disclosure provided further support for the claims to a person of skill.

### 2.  The Animal Example Supports the 0.5 mg Daily Dose

The district court found also that the animal example supports the claims, finding that example to be "complementary" to the human example. (Appx23 (¶ 53).) HEC attacks this finding (Br. 40), contending that the district court "incorrectly fused laboratory animal data with an untested and unproven hypothetical example, rather than properly considering the actual four corners of the

specification." This makes no sense—both examples are within the four corners of the specification, and must be read together.

In support of the claims, the court found the animal example reports "an effective dose of 0.3 mg/kg weekly" in the EAE model, and that "a person of skill would have converted the 0.3 mg/kg weekly dose to 0.042 mg/kg daily" (0.3 divided by 7) to compare that result with other published EAE results. (Appx24 (¶¶ 55–56) (citing Appx23325–23326 (Steinman Tr. 747:6–748:19); Appx23443–23445, Appx23482 (Jusko Tr. 865:12–24, 866:18–867:4, 904:2–18)).) A person of skill would then "immediately recognize that 0.3 mg/kg weekly (0.042 mg/kg daily) in rats" is "approximately 60% lower" than "the lowest known effective dose in the prior art (0.1 mg/kg daily)" in EAE studies. (Appx24–25 (¶ 57); *see also* Appx23440–23445 (Jusko Tr. 862:4–863:21, 865:3–867:4).) To a person of skill, that meant "a proportionally lower dose (again, roughly 60% lower)" than the lowest known human dose of 1.25 mg daily "could be effective[.]" (Appx24–25 (¶¶ 57–58); *see also* Appx23440–23445 (Jusko Tr. 862:4–863:21, 865:3–867:4); Appx23356–23357 (Steinman Tr. 778:25–779:14).) That equated to a 0.5 mg daily dose. (*See* Appx25 (¶ 59).) HEC does not dispute the underlying facts—that the prior art's lowest effective EAE dose was 0.1 mg/kg; that the inventors' lowest dose when converted to a daily measure is about 60% lower; that the lowest known effective human dose in June 2006 was 1.25 mg; or that a 60% lower dose is 0.5 mg.

Rather, HEC complains (Br. 53–57) that the Patent does not spell all this out in more detail.

There was no need. The inventors did the work for the reader by specifically identifying the 0.5 mg daily dose in the human example. How the inventors got from the animal to human dose is immaterial—"the path that leads an inventor to the invention is expressly made irrelevant to patentability by statute." *Life Techs., Inc. v. Clontech Labs. Inc.*, 224 F.3d 1320, 1325 (Fed. Cir. 2000). Accordingly, "[p]atentability shall not be negatived by the manner in which the invention was made." *Graham v John Deere Co.*, 383 U.S. 1, 13 (1966). An inventor need not describe the process of inventing, only the invention itself. HEC cites no case requiring the inventors to show these calculations. The invention was not a method of translating animal to human doses; it was the discovery of the disclosed use of the lower human dose itself. Unlike in HEC's cases, no prior art was needed to complete the disclosure. (*See supra* at 27–28.) The specification here identifies the exact claimed 0.5 mg daily dose to treat RRMS.

Novartis's pharmacologist witness Dr. Jusko summarized this point in his direct testimony:

> **Q.** . . . [W]hat does the second example tell a person of skill in pharmacology?
>
> **A.** The animal identified that the drug would work at a much lower dose than previously known to be effective. So the inventors recognize that

this would mean that patients could be treated with lower doses than previously known to be effective.

So they're describing what's – I've been hearing what's called a prophetic clinical trial. They described sort of a pilot study where 20 patients would be given 0.5 or 1.25 or 2.5 mg daily doses of the drug. They specified initial regimen that does not include a loading dose. They indicate with the words "treatment" more than one place that this regimen would be useful for treating patients with RRMS.

(Appx23442 (Jusko Tr. 864:1–18).) This testimony, cited by the district court

(Appx22 (¶ 50)), clearly explains the link between the animal and human examples.

If the reader were nonetheless curious, Novartis's experts further testified that

the link between the animal and human examples would have been self-evident to a

person of skill. As Dr. Lublin put it, "when you read the patent, . . . in the animal

experiment they said we've got it; a lower dose of fingolimod will work. They . . .

make the conversion to human dosing, and then they show this clinical trial and that

they're treating it. That's how I read the patent." (Appx22813–22814 (235:19–

236:8); *see also* Appx23332 (Steinman Tr. 754:16–21); Appx23443–23444 (Jusko

Tr. 865:25–866:9).) Again, this highlights the importance of a person of skill's

perspective, which HEC failed to provide. As the district court found, a person of

skill would recognize and understand the EAE experiment, its link to MS, the

connection between the Patent's examples, and how each supports the claims.

(Appx23–26 (¶¶ 54–60).) While HEC provided some testimony on parts of these

connections, it failed to provide key testimony on the human example. At any rate,

the district court was entitled to credit Novartis's testimony over any contrary testimony from HEC's witnesses. *Nalpropion*, 934 F.3d at 1348; *Vanda*, 887 F.3d at 1131.

Even if the law did require a person of skill to fully appreciate the animal to human link, "[i]t is well-established that a patent specification need not re-describe known prior art concepts." *Immunex Corp. v. Sandoz Inc.*, 964 F.3d 1049, 1064 (Fed. Cir. 2020). A "patent specification is written for a person of skill in the art, and such a person comes to the patent with the knowledge of what has come before"; so it accordingly "is unnecessary to spell out every detail of the invention in the specification; only enough must be included to convince a person of skill in the art that the inventor possessed the invention[.]" *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005) (internal citation omitted). Novartis could thus "rely on information" that was "'well-known in the art' to satisfy written description." *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1285 (Fed. Cir. 2012). As the district court found, Novartis's experts showed that all of the information needed would have been known to a person of skill already. (Appx23–26 (¶¶ 54–60).)

HEC again employs attorney argument (Br. 7) to attack the relevance of the animal example, asserting that the inventors' experiments were "solely studying angiogenesis in rats." In addition to lacking any support from a person of skill for

this assertion, HEC is also wrong. The inventors were studying fingolimod's mechanism of action, including its role in neo-angiogenesis, but that was not their sole focus. Their experiments revealed that lower doses could work, and that is what the '405 Patent claims. (*See supra* at 7–8.)

Finally, HEC suggests (Br. 56) that the expert and inventor testimony was in conflict, apparently because the inventors did not draft the human example or have any experience in designing or running clinical trials. But Mr. Hiestand unequivocally testified that he was "the first" to discover the 0.5 mg dose, which he recognized immediately from his animal experiment. (*See supra* at 8.) It is hardly surprising that the inventors—who were not patent lawyers—would know little about how prophetic examples are used in patents. Nothing they said is at odds with the experts' testimony.[12]

---

[12] HEC cites *Nuvo Pharmaceuticals*, 923 F.3d at 1381, to say that inventor testimony can illuminate a lack of written description. (Br. 56.) But *Nuvo*'s inventor was unable to identify any support in the specification for why his claimed invention supported the claims. 923 F.3d at 1381. Here, the inventors identified such support—the EAE experiment. (Appx22897–22900 (Hiestand Tr. 319:9–321:18, 322:3–19); Appx22903–22905 (Hiestand Tr. 325:19–327:13); Appx22910 (Hiestand Tr. 332:8–17).)

### III. The Specification Describes a "Daily" Dose Given "Initially," and Thus "Absent an Immediately Preceding Loading Dose Regimen"

Many of HEC's attacks on the claim phrase "absent an immediately preceding loading dose regimen" fail for the same reasons as its other written description attacks. As found by the district court based upon the expert testimony, the Patent text tells the person of skill that the human example's dosing regimen is absent an immediately preceding loading dose. The human example recites a dosing regimen of 0.5 mg *daily*, with that treatment to be given *initially*. These directions leave no room for a loading dose; thus, it is absent. The expert testimony on this was unrebutted. Accordingly, the district court's decision is well supported and not clearly erroneous.

### A. The District Court Correctly Read the Patent's Text to Support "Absent an Immediately Preceding Loading Dose Regimen"

HEC's main attack on the loading dose limitation is a straw man. Citing to MPEP § 2173.05(i), HEC pretends the district court found support for that part of the claims solely in the specification's alleged "silence" on loading doses. (Br. 26–27, 34–35 39–43.) That is not true. The district court relied on the Patent's actual text in paragraphs of the opinion that HEC fails even to cite, much less discuss.

Specifically, in Paragraphs 62 and 63, the district court found the human example describes the precise "daily" dose of "'0.5 . . . mg' fingolimod to treat RRMS." (Appx26 (¶ 62).) The parties agree that "[a] loading dose is necessarily a

higher-than-daily dose" (Appx23344 (Steinman Tr. 766:4–6); Appx23125 (Hoffman Tr. 547:8–18)), and the court found based on Novartis's unrebutted expert testimony that "starting with a daily dose plainly implies that there is no loading dose" (Appx27 (¶ 63)). Moreover, the example states the "treatment" is started "'initially'" for 2 to 6 months. That "tells a person of skill that on day 1, treatment begins with a daily dose of 0.5 mg, not a loading dose. If a loading dose were directed, the Patent would say that a loading dose should be administered 'initially.'" (Appx26 (¶ 62) (internal citations omitted).) In reaching these conclusions, the district court credited testimony from Novartis's witnesses about the human example—testimony HEC failed to rebut, as discussed above (at 15).

That HEC fails to address or even acknowledge the existence of the district court's actual opinion in paragraphs 62 and 63 speaks volumes.[13] Moreover, HEC's selective reading of the evidence is legally incorrect. As discussed above (at 36),

---

[13] Novartis submits that HEC has waived any further challenge to these paragraphs, and that it would be manifestly unfair to permit HEC to address these central paragraphs for the first time in reply. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived."); *id.* at 1320 (holding dispute of factual finding waived because "mere statements of disagreement with the district court . . . do not amount to a developed argument" and "a passing reference to an issue . . . will not suffice to bring that issue before this court" (internal citations omitted)). A finding of waiver here is particularly appropriate, as HEC cited the surrounding paragraphs of the court's analysis, while omitting what is in between. (*See* Br. 26, 39.)

the specification must be read as a whole, and the specification as a whole includes the express language from the specification the district court analyzes in Paragraphs 62 and 63 of the opinion.

The testimony of Novartis's expert physician witnesses Drs. Lublin and Steinman confirms the district court's holding that the specification supports the claims. For example, Dr. Lublin testified that the human example says "daily dosage"; "A loading dose is not a daily dose"; and the sentence "Initially, patients receive treatment for two to six months" suggests "they're taking the dosing that's outlined in that first sentence continually for two to six months," which does not "involve a loading dose." (Appx22791–22793 (213:23–215:4); *see also* Appx23334–23335, Appx23343–23344 (Steinman Tr. 756:16–757:8, 765:5–766:2); Appx23441–23442 (Jusko Tr. 863:22–864:18).)

To the extent HEC takes issue with the absence of the words "loading dose" in the specification, a specification need not set out claim terms "*in haec verba*." *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1376 (Fed. Cir. 2002); *see also Eiselstein v. Frank*, 52 F.3d 1035, 1038–39 (Fed. Cir. 1995) (specification "need not describe the claimed subject matter in exactly the same terms as used in the claims"). It is enough that "one skilled in the art would recognize upon reading the specification that the new language reflects what the specification shows has been invented." *All Dental Prodx, LLC v. Advantage Dental Products, Inc.*, 309

F.3d 774, 779 (Fed. Cir. 2002).  *See also Application of Wertheim*, 541 F.2d 257, 265 (C.C.P.A. 1976) (reversing rejection where "[t]he PTO has done nothing more than to argue lack of literal support, which is not enough"); *Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 424 F.3d 1161, 1166 (Fed. Cir. 2005) (finding adequate written description of exclusionary limitation despite absence of literal support); *infra* at 50–51 (discussing implicit disclosure).  Even MPEP § 2173, on which HEC relies (Br. 42) for its "silence" argument, states that "a lack of literal basis in the specification for a negative limitation may not be sufficient to establish . . . lack of descriptive support."  MPEP § 2173.05(i); *see also Ex parte Parks*, 30 USPQ 2d 1234, 1236 (B.P.A.I. 1993) ("Adequate description under the first paragraph of 35 U.S.C. 112 does not require literal support for the claimed invention.").

Here, the district court found that a person of skill would understand the inventors to have "possession" of a dose absent an immediately preceding loading dose regimen.  (Appx37 (¶ 24).)  There is ample support in the record for that finding.  The district court held that "daily" means every day, a construction HEC does not dispute here.  (Appx18670–18672 (Markman Opinion).)  The experts understood the patent's description of a "daily dose" as exclusive of a loading dose.  (Appx22791–22792 (Lublin Tr. 213:6–214:9); Appx23343 (Steinman Tr. 765:5–12).)  Experts further understood the word "initially" to mean beginning with 0.5 mg daily, and therefore not beginning with a loading dose regimen.  (Appx22792 (Lublin Tr.

214:10–20); Appx23334–23335, Appx23343–23344 (Steinman Tr. 756:16–757:8, 765:13–766:2); Appx23441–23442 (Jusko Tr. 863:22–864:18).)  Put another way, the inventors may not have used the words "absent an immediately preceding loading dose regimen," but the words they did use, in the context of the specification taken as a whole, communicate that the 0.5 mg daily dose was "absent an immediately preceding loading dose regimen."

HEC cites (Br. 33–34) its own unofficial transcription of the oral argument in the IPR appeal as support.  That transcription is not evidence.  It at most reflects colloquy about a different case, subject to a different burden of proof, with a different record. [14]  Questions from the bench at oral argument are non-binding and exploratory, *see, e.g.*, *Acrow Corp. of Am. v. U.S.*, 97 Fed. Cl. 182, 186 n.3 (Fed. Cl. 2011), and the record here provides a complete answer to why the specification supports the claims.

---

[14] Here, the district court witnessed live testimony and determined that Novartis's experts should be "credited" (Appx26200 (Post-Trial Opinion Denying HEC's Motion to Stay Judgment)), including on issues on which HEC presented no testimony (*see supra* at 15).  Among other things, Novartis's testimony in the district court focused on the word "initially" in the specification (*see supra* at 44–45), a word not addressed in the IPR decision (*see generally* Appx209–268 (IPR Final Written Decision)).

### B.     The District Court Properly Applied the *Ariad* Standard for Written Description

HEC argues that *Ariad* should not apply to the loading dose phrase, and instead that one of three other cases should govern. HEC is wrong.

***First***, HEC argues that the "absent an immediately preceding loading dose regimen" clause is a "negative limitation," and that the standard for such a limitation is that "the specification must 'describe[] a reason to exclude the relevant limitation.'" (Br. 41 (citing *Inphi Corp. v. Netlist, Inc.*, 805 F.3d 1350, 1350 (Fed. Cir. 2015) (quoting *Santarus*, 694 F.3d at 1351).) This is not the law.

HEC, not the caselaw, adds the mandatory "must" language to its citation of *Inphi* and *Santarus*; that language does not appear in either opinion. *Santarus* merely reflects that a "reason to exclude" can be one way to support a negative limitation, not the only way. The *Inphi* court confirmed that "[w]hen viewed in its proper context, *Santarus* simply reflects the fact that the specification need only satisfy the requirements of § 112, paragraph 1 as described in this court's existing jurisprudence[.]" 805 F.3d at 1356. And a case HEC never cites (but which was briefed below)—*Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1348 (Fed. Cir. 2016), *overruled on other grounds by Aqua Products, Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017)—holds unequivocally that "*Santarus* did not create a heightened standard

for written description support of negative limitations." *Ariad* controls here, as elsewhere.[15]

That makes sense. The *Santarus* court credited an expert's view that the specification provided a reason to exclude in that case, so the court never had to address other ways to provide written description. *See* 694 F.3d at 1351. Even HEC acknowledges elsewhere in its brief (Br. 42) that "there may be several ways to meet the written description for a negative claim limitation." The *Inphi* court later confirmed that "[w]hen viewed in its proper context, *Santarus* simply reflects the fact that the specification need only satisfy the requirements of § 112, paragraph 1 as described in this court's existing jurisprudence," 805 F.3d at 1356, *i.e.*, "the customary standard for the written description requirement[,]" *Nike*, 812 F.3d at 1348. That "customary standard" does not depend on a reason to exclude, and none was considered in *Nike*. *See* 812 F.3d at 1348–50. The standard is the *Ariad* analysis the district court performed below.

---

[15] Even if a reason to exclude were required, the record here provides one. HEC's own expert admitted that fingolimod has well-known, first-dose side effects—specifically, "bradycardia," a slowing of the heart rate. (Appx23126 (Hoffman Tr. 549:3–14).) The prior art showed that those effects were worse at higher doses. (*Id.*; Appx22794 (Lublin Tr. 216:11–20).) Thus, the choice of fingolimod for the claimed invention provided a ready-made reason to exclude a loading dose, which would involve a high initial dose that is more likely to cause bradycardia than a regular dose.

***Second***, HEC tries to conjure another standard—that a person of skill supposedly "must be able to recognize from the priority application itself that the claimed exclusion was specifically intended as of the priority date." (Br. 41.) HEC even puts "specifically intends" in separate quotation marks, implying that the phrase is from *Santarus*. (*Id*.) It is not—that idea is HEC's alone. It has no basis in law. *Ariad* controls, and that is what the district court applied in finding that the claims were supported under 35 U.S.C. § 112.

***Third***, HEC argues (Br. 40, 43) that the district court clearly erred because the specification could not "necessarily" disclose the exclusion of the loading dose limitation. Insofar as HEC suggests that inherent disclosure is the only way for there to be non-literal support for a claim, HEC did not make this argument below, and as such it is waived. *Fresenius*, 582 F.3d at 1295–96. Nor did Novartis argue below that inherency, which usually arises in the context of a claim to a compound "that has certain undisclosed yet inherent properties," applies to the '405 Patent's method claims. *Yeda Research and Dev. Co. v. Abbott GMBH & Co.*, 837 F.3d 1341, 1345 (Fed. Cir. 2016). Rather, as discussed above (at 44–45), the district court relied on explicit text in the specification that conveys to a person of skill that a loading dose is not used.

At any rate, the law does not require the disclosure to be inherent or necessary: The written description requirement may equally be satisfied by implicit disclosure.

*See In re Kolstad*, No. 90–1096, 1990 WL 71370, at *1 (Fed. Cir. June 1, 1990)

("The manner in which the specification meets the [written description] requirement

is not material; the requirement may be met by either an express or an implicit

disclosure."); MPEP § 2163(II)(A)(3)(b) ("To comply with the written description

requirement of 35 U.S.C. 112(a) . . . each claim limitation must be expressly,

implicitly, or inherently supported in the originally filed disclosure."); *Inphi*, 805

F.3d at 1354 (written description is satisfied "when the essence of the original

disclosure conveys the necessary information—regardless of *how* it conveys such

information"); cases cited *supra* at 45–46.

Finally, even if inherency were relevant here, Novartis's expert testified that

"by starting out with a daily dose," the specification "necessarily preclude[s] a

loading dose." (Appx23344 (Steinman Tr. 766:7–21); *see also* Appx23334–23335

(Steinman Tr. 756:16–757:8) (if a loading dose were included, it would

"necessarily" be described before the initial treatment, and the specification

"necessarily would have put it in"); *Hyatt v. Boone*, 146 F.3d 1348, 1354–55 (Fed.

Cir. 1998) (applicant may show written description by showing "that any absent text

is necessarily comprehended in the description provided and would have been so

understood at the time the patent application was filed").) To the extent there was

any contrary testimony, the district court was entitled to credit Dr. Steinman's

testimony. *Nalpropion*, 934 F.3d at 1348; *Vanda*, 887 F.3d 1117 at 1131.

### C.  The Prosecution History Supports the Claims

Throughout its brief, HEC suggests (*e.g.*, Br. 13, 18–21, 53) that the narrowing of the claims during prosecution shows a lack of possession.  Specifically, HEC takes issue (Br. 41) with Novartis's amendment during examination to address an examiner rejection with the phrase "absent an immediately preceding loading dose regimen."  But amendments like this are routine.[16]  This Court has regularly found written description in the context of such amendments—even when not literally mentioned in the specification—so long as they are otherwise conveyed by the text, context, or embodiments.[17]  And here, Novartis's experts testified that a person of skill in the art looking at the specification would clearly understand the loading dose limitation to have been part of the disclosed invention.  (*See supra* at 45–47.)

The presumption of validity rests in the belief that patent examiners do their jobs.  *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 97 (2011) (observing presumption of validity's grounding in "'the basic proposition that a government agency such as the [PTO] was presumed to do its job'") (quoting *American Hoist &*

---

[16]  *See Santarus*, 694 F. 3d at 1359 (Newman, J., concurring-in-part, dissenting-in-part) ("a negative limitation may be prudently placed in a claim in response to an examiner's rejection, perhaps to distinguish a reference that was given its 'broadest reasonable interpretation' for purposes of examination"); 37 C.F.R. §§ 1.111(a), 1.115(a)–(b).

[17]  *See, e.g.*, *All Dental*, 309 F.3d at 777–79*; Pandrol*, 424 F.3d at 1166.

*Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984)).  That

presumption was amply borne out here, with multiple communications from the

Examiner evidencing a rigorous review (*see, e.g.*, Appx25243, Appx25339–25353,

Appx25417 ('405 Patent File History)).

Indeed, the Examiner found the new claims here supported.  If they had not

been, then the Examiner would have declined the changes as improper "new matter."

*Glaxo Wellcome, Inc. v. Impax Labs., Inc.*, 356 F.3d 1348, 1354 (Fed. Cir. 2004)

("The new matter doctrine prevents an applicant from adding new subject matter to

the claims unless the specification shows that the inventor had support for the

addition at the time of the original filing.").  The specification set forth dosing

parameters from the outset, including the exact dose in the claims.[18]  That the claims

were narrowed over time simply showed the Examiner was doing his job.[19]

Likewise, to the extent "[t]he claims were crafted only after the commercial features

---

[18]  HEC speculates that the application did not "claim[] RRMS or any dosing
parameters" because "[f]ingolimod's impact on RRMS was largely unknown."
(Br. 19.)  This is incorrect.  By June 2006, a Phase II trial was completed and
showed fingolimod's efficacy for RRMS.  (Appx23349 (Steinman Tr. 771:9–25);
Appx23476–23477 (Jusko Tr. 898:15–899:10); Appx24777 (Kappos 2005).)

[19]  *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558, 638
(Fed. Cir. 2000), *vacated on other grounds*, 535 U.S. 722 (2002) ("It has been
routine practice for patent solicitors to initially present broad claims to an
invention, in the expectation of honing the claims in interaction with the
examiner.") (Newman, J., concurring-in-part and dissenting-in-part).

were finalized" (Br. 18; *see also id.* 19–22, 53), that is also legally irrelevant.[20]  The

relevant issue is whether the inventors were "as of the filing date . . . in possession

of . . . *whatever is now claimed.*"  *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563–

64 (Fed. Cir. 1991) (emphasis in original).  They were.

The prosecution history thus supports Novartis, not HEC.  HEC identifies no

priority date dispute, Examiner misstep, or technical defect in any step in the

prosecution process.  If anything, the prosecution's duration and the claims'

narrowing over time show only the Examiner's thoroughness.

## IV.  The District Court's Written Description Conclusions Were Consistent with How the Court Read Kappos 2006

With respect to both the 0.5 mg daily dose and the absence of a loading dose,

HEC argues (Br. 8, 27, 32, 44, 59–61) that the district court read the human example

and Kappos 2006 abstract (HEC's alleged anticipation reference) inconsistently.

That HEC does not challenge the district court's finding of lack of anticipation nor

the exclusion of HEC's declaration evidence of the Kappos 2006 publication date as

hearsay (Appx38–42 (¶¶ 27–38); Appx28–29 (¶¶ 68–71)) shows Kappos 2006's

irrelevance to this written description appeal.

---

[20] *See, e.g., Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988) (not "in any manner improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application").

HEC ignores that the inherent anticipation standard applied to Kappos 2006 is different from the written description standard. Inherent anticipation "requires that the missing descriptive material is 'necessarily present,' not merely probably or possibly present, in the prior art." *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002). Written description exists if the specification "reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad*, 598 F.3d at 1351. The district court's findings under these different statutes and corresponding different standards cannot be meaningfully compared. The specification would have reasonably conveyed to a person of skill in June 2006 that the inventors possessed the claimed invention—regardless of whether a loading dose or treatment were "necessarily present" in Kappos 2006.

That is partly because the Patent and Kappos 2006 are different types of documents, as the district court found. (Appx26, Appx29–30 (¶¶ 61–62, 71, 74).) A person of skill would read the Patent to be a complete description of a dosing invention. (Appx22791–22793 (Lublin Tr. 213:1–215:15); Appx23342–23344 (Steinman Tr. 764:19–766:15); Appx23474–23475 (Jusko Tr. 896:18–897:13).) By contrast, they would read Kappos 2006 as a short, necessarily incomplete synopsis of an upcoming clinical trial. (Appx22780–22783 (Lublin Tr. 202:19–203:13, 204:12–205:1); Appx23474–23475 (Jusko Tr. 896:7–897:13); Appx23163–23165

(Hoffman Tr. 585:22–587:1); Appx23077 (Savic Tr. 499:14–19).)  The documents are legally distinct, too.  The Patent is a presumptively enabling description of an invention to treat RRMS.  *See Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F.3d 1330, 1337 (Fed. Cir. 2013) (issued patent presumptively enabled).  But as the district court found, Kappos 2006 is not enabled for that purpose.  (Appx30 (¶ 75).)

The Patent and Kappos 2006 also have different contents.  Importantly, the Patent supports the human example with an animal study not in Kappos 2006.  (Appx23 (¶ 53); Appx30 (¶ 75); *supra* at 38–42.)  The Patent's human example further describes the claimed dose as a "treatment," whereas the district court found that Kappos describes an upcoming test, not a treatment.  (Appx24741 (11:13–16); Appx22, Appx29–30 (¶¶ 49–50, 72–73).)

Thus, contrary to HEC's arguments (Br. 27, 42–43), testimony about the different documents was also not inconsistent—HEC itself acknowledges (Br. 42) mixing and matching testimony about the prior art and the specification as HEC does here is inappropriate.  But even if there were an inconsistency, a district court's choice between conflicting testimony provides no basis for clear error reversal.  *Nalpropion*, 934 F.3d at 1348 ("'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'") (quoting *Anderson*, 470 U.S. at 574); *Vanda*, 887 F.3d at 1131.

As part of this misguided attack, HEC characterizes (Br. 46) the district court's finding that a patent is presumed complete (Appx30 (¶ 74)) as "legally unsupported." On the contrary, a patent's original specification is presumed complete as a matter of law. *Eldred v. Ashcroft*, 537 U.S. 186, 224 (2003) ("[c]omplete disclosure" is a "precondition to the issuance of a patent"). In any event, the person of skill's understanding of these technical documents is a fact issue, not a legal issue. The district court's factual findings on this issue are well supported, as shown above.

HEC's remaining assertions are unsupported attorney argument. Without citation, HEC complains (Br. 46) that Novartis's experts were not qualified as experts in patent law. But Novartis's experts do not need to be experts in patent law to opine on *how a person of skill* would read these documents. HEC also calls Novartis's expert's testimony "incoherent," but cites no contradictory testimony. *Id.*[21]

---

[21] Indeed, to support HEC's anticipation argument, HEC's experts testified that Kappos 2006 does exclude a loading dose (Appx23081 (Savic Tr. 503:5–24); Appx23127–23128 (Hoffman Tr. 549:23–550:22)), which if anything supports the district court's finding that the '405 Patent specification also excludes a loading dose. If, as HEC's experts contended, a "daily dose" in an incomplete document like Kappos 2006 would preclude a loading dose, then that same reasoning would apply with even greater force to a complete disclosure like the Patent.

In short, the district court found that a person of skill would read the specification to exclude for a loading dose regimen. Ample evidence supported that conclusion, evidence that was largely if not entirely undisputed. Loading doses are higher-than-daily doses, but the specification prescribes only daily doses, given initially, and for 2 to 6 months. That dosing regimen excludes a loading dose, and the district court was correct—and certainly committed no clear error—in finding for Novartis on written description.

## CONCLUSION

For the reasons discussed herein, the district court's decision should be affirmed.

Dated: March 9, 2021     Respectfully submitted,

           By: */s/ Jane M. Love*
             Jane M. Love, Ph.D.

*  Counsel for Appellee Novartis Pharmaceuticals Corporation*

# CERTIFICATE OF SERVICE

I, Jane M. Love, Ph.D., hereby certify that I caused the foregoing to be filed via the Court's CM/ECF system and served on counsel of record by electronic mail on  March 9, 2021.


*/s/ Jane M. Love*
Jane M. Love, Ph.D.

# CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 13,970 words, as determined by the word count function of Microsoft Word 2016, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman, 14-point.

*/s/ Jane M. Love*
Jane M. Love, Ph.D.